## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF IOWA

| | | |
|---|---|---|
| **JOHN PORTER**<br>212 NE Grant Street<br>Greenfield, IA 50849 | : | |
| | : | |
| and | : | |
| | : | |
| **KATHY PORTER**<br>212 NE Grant Street<br>Greenfield, IA 50849 | : | |
| | : | |
| Plaintiffs, | : | |
| vs. | : | Case No. _____ |
| | : | |
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| Serve: | : | |
| | : | |
| Attorney General of the United States<br>Main Justice Building<br>10ᵗʰ & Constitution Ave, NW<br>Washington, DC  20530 | : | |
| | : | |
| U.S. Attorney for the Southern District of Iowa<br>U.S. Courthouse Annex<br>110 East Court Avenue, Suite # 286<br>Des Moines, Iowa 50309-2053 | : | |
| | : | |
| Defendant. | : | |

## COMPLAINT
### (Federal Tort Claims Act)

1. Plaintiffs John Porter and Kathy Porter sue the defendant United States of America pursuant to the Federal Tort Claims Act, 28 U.S.C. § 1346(b), for injuries and damages they experienced because of negligence by employees of the defendant at the VA Central Iowa Health Care System (the "VA"), in Des Moines, Iowa.

2. An administrative claim was timely presented to the U.S. Department of Veterans Affairs more than six months before the filing of this Complaint. The claim has not been granted and therefore is deemed to have been denied.

3. This Court has jurisdiction over this case pursuant to the Federal Tort Claims Act, 28 U.S.C. § 1346(b).

4. John Porter is a 66 year old Vietnam veteran, who served in the United States Air Force from 1968 until 1971, when he was honorably discharged at the rank of Sergeant (E-4).

5. Mr. Porter had no significant medical history related to his heart until October 2011, when he presented to the VA in Des Moines, complaining of tightness in his chest, and fatigue.

6. On October 18, 2011, Mr. Porter called the VA in Des Moines, complaining of 5-6 episodes of tightness in his chest over the prior month, lasting 2-3 minutes each.

7. Later in the day on October 18, 2011, Mr. Porter reported to the ER at the VA in Des Moines, complaining of chest pain, with pain and weakness radiating to his arms.

8. Dr. David Pearce Brown ordered an EKG, which showed t-wave abnormalities, and noted, "Atypical Chest Pain. Currently no evidence of acute coronary syndrome. With ekg findings and complaint of chest pain, ER will place an order for a treadmill stress test."

9. Dr. Brown's note, reflecting Mr. Porter's symptoms and test results, was forwarded to Dr. Manglik, who reviewed it the next day.

2

10. On October 31, 2011, Mr. Porter saw Dr. Manglik, but according to the note from that visit, Dr. Manglik did not ask Mr. Porter about his recent hospital visit, his chest pain, or his EKG results. Dr. Manglik asked Mr. Porter to return to the clinic in six months.

11. On November 7, 2011, Mr. Porter returned to the VA in Des Moines for the stress test/myocardial perfusion ordered by Dr. Brown. This test showed that Mr. Porter had an ejection fraction of approximately 25%, and according to Dr. John Berger, who interpreted the results, it showed a probable dilated cardiomyopathy.

12. Dilated cardiomyopathy is a heart disease that results in the weakening and enlargement of the heart muscle and is a form of congestive heart failure.

13. Ejection fraction measures systolic function, or how much blood the left ventricle pumps out with each contraction. A normal ejection fraction is between 55% and 70%. An ejection fraction of 25% (what Mr. Porter had in 2011) is a sign of cardiomyopathy and heart failure.

14. According to the progress note from November 7, 2011, written by Nurse Practitioner Angela McGinnis, the plan was for the referring provider (Dr. Brown) to review the stress test results. But it appears that no VA personnel forwarded the results to Dr. Brown or Dr. Manglik, or any other physician.

15. Mr. Porter continued to see Dr. Manglik regularly over the next few years, but Dr. Manglik never checked on the results of the stress test or followed up on the abnormal EKG. Mr. Porter complained to Dr. Manglik of a lack of energy and stamina during this time.

3

16. In January 2014, Mr. Porter had chest pain while he was in Arizona. He went to a VA clinic in Phoenix, which sent him to the emergency room at Mercy Gilbert Medical Center.

17. Doctors at Mercy Gilbert Medical Center performed an EKG, echocardiogram, and cardiac catheterization. These tests showed that Mr. Porter had an ejection fraction of 15%. The doctor performing the cardiac catheterization diagnosed Mr. Porter with dilated cardiomyopathy, based on Mr. Porter's symptoms and his severe left ventricular systolic dysfunction.

18. The doctors at Mercy Gilbert Medical Center started Mr. Porter on a beta-blocker (Cavedilol), an ACE inhibitor (Lisinopril) and a cardiac glycoside (Digoxin), and discharged Mr. Porter on a LifeVest (a wearable defibrillator).

19. On April 29, 2014, Mr. Porter saw Dr. Dirk Ver Steeg, a cardiologist at the VA in Des Moines, who wrote, "Of note, is the fact that his patient had myocardial perfusion imaging at this medical center 11/07/11, done for atypical chest pain, which showed normal myocardial perfusion, but an ejection fraction of 25%. It is evident to me after review of the record that this report unfortunately did not reach his primary care physician, and cardiology did not see him at that time."

20. Dr. Ver Steeg assessed Mr. Porter as having "chronic, non-ischemic cardiomyopathy" and noted, "I ordinarily would spend a bit more time titrating his medications up and seeing if his ventricular function is recovering, but it has now been 3 months since diagnosis on some medical therapy (this was present in 2011 per MIBI report,

4

however) and quite frankly this cardiomyopathy has been present for at least three years, probably longer, and I doubt there will be much progress made as far as his ejection fraction is concerned."

21. Dr. Ver Steeg ordered a follow up EKG on May 12, 2014. This test showed that with treatment, Mr. Porter's ejection fraction improved mildly to 20-25%, from the 15% it was in January.

22. Mr. Porter's cardiomyopathy was still severe enough that Dr. Dwayne Campbell, a cardiologist at the Des Moines VA, ordered Mr. Porter to receive a pacemaker/defibrillator, which was surgically implanted on June 10, 2014.

23. In December 2014, the VA rated Mr. Porter at a 100% disability level, based on the VA's own medical opinion, from Dr. Isaac Witkowski, who wrote in his report: "Based on a thorough record review, it is at least as likely as not that an error in judgment occurred on the part of [the] VA in reviewing [Mr. Porter's] cardiac studies in 2011, as it appears the ejection fraction may not have been passed on to the appropriate providers in a timely fashion, as noted clearly by his physicians in Des Moines (4/30/14, Dr. DVS)."

24. This led Dr. Witkowski to conclude that the VA's "carelessness, negligence, lack of proper skills, error in judgment, or similar instance of fault on the part of the VA" had worsened Mr. Porter's cardiomyopathy.

25. As Dr. Ver Steeg mentioned in his April 29, 2014 note, earlier treatment was necessary to improve Mr. Porter's heart failure. Although Mr. Porter's condition

improved somewhat with treatment that began in January 2014, an ejection fraction of 20 – 25% is still abnormally low.

26. The VA and its employees were negligent in failing to begin treatment of Mr. Porter when they discovered he had cardiomyopathy in November 2011, and in failing to inform Mr. Porter of his cardiomyopathy when they discovered it.

27. The healthcare providers who were involved with Mr. Porter's stress test on November 7, 2011, failed to provide the results of that test to Mr. Porter's primary care physician, Dr. Manglik, or the physician who ordered the test, Dr. Brown.

28. Mr. Porter's treating physicians – Dr. Manglik and Dr. Brown – failed to follow up on Mr. Porter's abnormal October 18, 2011 EKG, and on the results of Mr. Porter's November 7, 2011 stress test, which showed that he had cardiomyopathy.

29. Because of the VA's delay in treating Mr. Porter, his ejection fraction is permanently diminished, and his life expectancy reduced.

30. Had the VA treated Mr. Porter sooner, when it first determined that he had heart failure in November 2011, his condition would likely have improved more than it did in 2014, when treatment finally began. Instead of having mild systolic function (or even having his systolic function return to a normal range), Mr. Porter now has permanent, severe systolic dysfunction.

31. Because of his worsened condition, Mr. Porter has more difficulty with physical activity, including walking and any other activity that requires physical exertion.

32. Earlier treatment would have improved Mr. Porter's heart condition to a degree that he would not likely have difficulty with physical exertion.

33. Kathy Porter and John Porter were married on August 3, 2009.

34. Kathy Porter claims a loss of consortium due to the VA's delay in treating Mr. Porter's cardiomyopathy.

35. Mr. and Mrs. Porter have rarely been intimate due to Mr. Porter's heart condition and inability to exert himself. In addition, Mrs. Porter has had to perform additional tasks around the house, and in caring for Mr. Porter, due to his physical limitations.

36. Plaintiffs John and Kathy Porter demand judgment against the defendant United States of America for $5,000,000 for each of their claims, plus interest and costs.

Respectfully submitted,

Marc Harding, Esq.
Harding Law Offices
1217 Army Post
Des Moines, Iowa 50315

*Of Counsel:*

Patrick A. Malone, Esq.
Daniel C. Scialpi, Esq.
Patrick Malone and Associates, P.C.
1111 16th St. NW
Suite 400
Washington, D.C. 20016

*Attorney for the Plaintiffs*